## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Eric Rolfs

    v.                                Civil No. 11-cv-501-LM
                                            Opinion No. 2013 DNH 121 P

Home Depot U.S.A., Inc.

### O R D E R

Asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and New Hampshire's Law Against Discrimination, N.H. Rev. Stat. Ann. ("RSA") ch. 354-A, Eric Rolfs has sued his former employer, Home Depot U.S.A., Inc. ("Home Depot") for sex discrimination (Count I) and retaliation (Count II).  Before the court is defendant's motion for summary judgment.  Plaintiff objects.  For the reasons that follow, defendant's motion for summary judgment is granted.

### Summary Judgment Standard

"Summary judgment is warranted where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" McGair v. Am. Bankers Ins. Co. of Fla., 693 F.3d 94, 99 (1st Cir. 2012) (quoting Fed. R. Civ. P. 56(a); citing Rosciti v. Ins. Co. of Penn., 659 F.3d 92, 96 (1st Cir. 2011)).  "In determining whether a genuine issue of material fact exists, [the court] construe[s] the evidence in

the light most favorable to the non-moving party and make[s] all reasonable inferences in that party's favor." Markel Am. Ins. Co. v. Díaz-Santiago, 674 F.3d 21, 30 (1st Cir. 2011) (citing Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004)).

"The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corporación de P.R. para la Diffusión Pública, 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)). "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

"The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012)) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)). "However, 'a conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden.'" Sánchez-Rodríguez, 673 F.3d at 9 (quoting DePoutot v. Raffaelly, 424

2

F.3d 112, 117 (1st Cir. 2005)).  "Rather, the party seeking to
avoid summary judgment must be able to point to specific,
competent evidence to support his [or her] claim."  Sánchez-
Rodríguez, 673 F.3d at 9 (quoting Soto-Ocasio v. Fed. Ex. Corp.,
150 F.3d 14, 18 (1st Cir. 1998)) (internal quotation marks
omitted).

### Background

A good argument could be made that Home Depot's ten-page,
fifty-two paragraph statement of material facts is more
extensive than the "short and concise statement of material
facts," LR 7.2(b)(1) (emphasis added), contemplated by the Local
Rules of this District.  Rolfs' Rule 7.2(b)(2) counter
statement, which runs for more than eighteen pages, is longer,
less concise, and more argumentative than Home Depot's
statement.  In addition, Rolfs does not identify a single fact
from Home Depot's statement "as to which [it] contends a genuine
dispute exists so as to require a trial."  LR 7.2(b)(2).
Because Rolfs does not challenge any of the facts in Home
Depot's statement, those "that are supported by appropriate
record citations," LR 7.2(b)(1), are, necessarily, deemed
admitted, see LR 7.2(b)(2).  Accordingly, the facts related in
this section are drawn, in the first instance, from Home Depot's
memorandum of law, see id., but are also augmented by facts

drawn from "other materials in the record," Fed. R. Civ. P. 56(c)(3).

Rolfs started working for Home Depot in 2004 and was made manager of Home Depot's Manchester store in 2006.  In early 2008, Gene Kelly became Rolfs' District Manager.  Shortly after Kelly assumed that position, he took several of his store managers, including Rolfs, to a strip club.  There is no evidence that Rolfs went unwillingly.  As Rolfs' District Manager, Kelly visited Rolfs' store once or twice a week, and generally spent between thirty minutes and two hours "walking" the store and discussing his findings with Rolfs.

At some point in mid to late 2008, during one of Kelly's visits to Rolfs' store, Rolfs introduced Kelly to one of his customers, a woman who worked as buyer for a local contractor and who visited his store relatively frequently.[1]  After Kelly shook the customer's hand, "he walked behind her and kind of went, whoa [and] rolled his eyes."  Doc. no. 30-31 (Rolfs Dep.), at 22.[2]

---

[1] Hereafter, I refer to the female buyer who frequently visited Rolfs' store either as "customer" or "female customer."

[2] When providing pinpoint citations to attachments to pleadings, I use the page number in the ECF header rather than the page number in the underlying document.  For example, page 95 of Rolfs' November 6, 2012, deposition is page 32 of document no. 30-31, and I use the latter page number rather than the former.

Between the time Kelly first met the customer and the end of 2008, Kelly made comments about her to Rolfs, or made physical gestures such as a thumbs-up, between five and ten times.  In particular, Kelly referred to the customer as "a nice piece of ass," doc. no. 30-31 (Rolfs Dep.), at 23, and asked Rolfs when he was "going to put it to her," id. at 33.  When Rolfs expressed disinterest in pursuing sexual relations with the customer, Kelly asked him whether he was "a homo," id. at 38.[3]  In 2008, Rolfs did not mention Kelly's in-store boorishness to anyone at Home Depot and did not ask Kelly to stop it. Rather, he tried to change the subject when Kelly started talking about the female customer.

In January of 2009, Rolfs attended a Home Depot holiday that was being held at a restaurant.  Near the end of it, Kelly launched into a loud discussion of Rolfs' interactions with the female customer.[4]  Kelly initially directed his remarks to guests at the party, but subsequently spoke to two other diners at the restaurant who were not attending the party.  In his deposition, Rolfs described Kelly as saying:

---

[3] Hereafter, I refer to this conduct and conduct like it, collectively, as Kelly's "in-store boorishness."

[4] Hereafter, I refer to this conduct as Kelly's "party rant."

[to other Home Depot employees:] Look at this fucking
homo.  He's a – he's a, you know, What is he a fag?
He's not going to fuck – just because he's married
he's not going to fuck this smoking hot piece of ass?
I mean, she's all over him and he just won't do it
just 'cause he's married?

.  .  .  .

.  .  . Oh, I'd love to just give it to her hard, you
know, and he won't do it just because he's married and
blah, blah, blah, blah.  .  .  . [to other diners in
the restaurant not associated with the Home Depot
party:] Look at this fucking homo.  He just won't
cheat on his wife just because – or he won't fuck this
smoking hot piece of ass just because he's married.
Can you believe that?  Can you believe this guy?

.  .  .  .

[to Rolfs:] You're a fucking homo.  You're a fucking
pussy.  You know, just because you're married, you're
not going to fuck this smoking hot piece of ass.  [to
other diners:] Can you believe this fucking homo for
not .  .  . fucking this woman.

Doc. no. 24-1, at 9-11.

On the way out of the party, Kelly told several of the
attendees that he was taking them to a strip club.  Rolfs went
along.

After the holiday party, Kelly continued to make comments
about Rolfs' female customer that were similar to those he made
before the holiday party.  Then, an incident occurred during one
of Kelly's store visits that Rolfs has described this way:

A.   .  .  . [I]t got to the point where it was
excessive after the Christmas party and he said to me,
Hey, what are you going to do?  She was – I was
getting called up to that area, to the pro desk again

6

for her [i.e., the female customer].  And whenever
you're walking with a district manager, they even know
that the customer takes precedent, and Gene was
cognizant of that fact, so he was walking up with me.

   And comments – we were approximately near
the lumber aisle, and I'll never forget this, he said,
Hey, you know, there's no one out back, are you going
to take her?  Whatever, some kind of a[n] off-colored
comment that really finally was it.  And I said, Come
on, Gene, and I threw my hands up and I walked away.
I walked up to the pro desk because she was there.

   Now, whether he just slowed down because I
was going to speak to the customer or whether I
outpaced him, I don't know, but we separated after
that and I dealt with the customer.  And he – when I
went to go look for him afterwards, he had his stuff
and was leaving and forever after that it was changed.
That was the defining moment.  I'll never forget it.

   Q.   When did that occur?

   A.   It was approximately in – some time in
around spring to summer of 2009.

Doc. no. 30–31 (Rolfs Dep.), at 25–26.  Later in his deposition,

Rolfs further described the "Come on, Gene" incident:

   A.   Again, it was everything I've already said,
but we were walking up, and I could see her [the
female customer] at the desk because you can see them
from the area we were walking near the lumber aisle,
you can actually see the pro desk from where we were.
I don't know if that had something to do with it
because as we were walking up I don't know if – I'm
saying to myself she's going to look at this district
manager, who she already said to me is creepy, is he
making eyes?  Is she going to see this?  Is she seeing
me?  I'm trying not to look, okay, so I don't know if
that put pressure on me to say come on – because he
was making comments as we were walking up to the desk,
okay.

So as somebody's making comments about someone that you're walking up to meet, it throws your train of thought off because you're trying to think about what you're going to do, to say to this person, say hello, you know, you're trying to get ready for the interaction.  Then you've got this other person saying to you hey, you know, when are you just going to fuck her, whatever?  When are you just going to get it over with, right?  I don't know if the whole thing just came to a head at that moment because she was there, he was there, we were walking and I felt pressure because we were walking up and I said – finally, I said, that's it, no more of this I said, "Come on, Gene," and I walked away.  . . .

Q.  But you didn't say that's enough, no more, you said "Come on, Gene"?

A.  I said come on.

Q.  You didn't say anything other than "Come on, Gene"?

A.  No, but – I didn't say anything.  I said, "Come on, Gene," and I threw my hands up.

Doc. no. 24-1, at 26-27.

The "Come on, Gene" incident was the first time Rolfs ever said anything to Kelly about Kelly's comments concerning the female customer.  After the "Come on, Gene" incident, Kelly did not engage in any further in-store boorishness.  However, on several occasions, another manager who had attended the holiday party mentioned the party in the presence of Kelly and Rolfs, and Kelly did nothing to cut off the other manager's comments.

According to Rolfs, during the fall of 2009, Kelly made various management decisions with the express purpose of setting

him up to fail.  Specifically, Rolfs claims that Kelly assigned
his two most effective assistant managers to other stores, and
replaced them with chronically underperforming assistant
managers, and did so at times when such changes would be
particularly disruptive.

In late October or early November of 2009, Kelly walked
Rolfs' store with Paul Deveno, Home Depot's Regional Vice
President.  Deveno identified several deficiencies.  Thereafter,
Kelly issued Rolfs a Performance/Discipline Notice ("P/DN"),
document no. 24-8, dated November 8, 2009.  The P/DN identified
problems with customer service, holiday set-up, and performance
"on the D25 Gold Cup" during the week of November 2.  In
December, Kelly issued Rolfs a second P/DN, document no. 24-9,
based upon maintenance problems identified during a December 3
store walk.[5]  Rolfs' second P/DN also includes the following
statement: "Please note that three (3) or more documented
performance counseling's on a Performance and Discipline Notice
within a rolling three month period require a Performance
Improvement Plan."  Doc. no. 24-9, at 2.

Rolfs alleges that the store walk that resulted in his
first P/DN was scheduled for a day when Kelly knew that he would

---

[5] That P/DN is dated December 4, 2009, but also bears a
handwritten date suggesting that Kelly discussed its contents
with Rolfs on December 17.

be away from his store.  Rolfs also argues that the criticisms
in the two P/DNs were inaccurate, overly subjective, or based on
conditions that resulted from Kelly's own management decisions
which, in Rolfs' view, were made in order to make him look bad.

On December 17, Rolfs spoke by telephone with Charles
Worcester, Home Depot's Regional Associate Relations Manager.
He mentioned his two P/DNs, Kelly's in-store boorishness, and
the party rant.

Two days after the telephone conversation, Rolfs sent
Worcester an e-mail in which he discussed the P/DNs, and also
wrote:

> The writeups I've spoken to you about as I see it
> are preemptive strikes on my career due to me being
> the focus of a drunken sexual harassment tirade by
> Gene Kelly that took place in front of every store
> manager in the district at our Christmas party last
> year.  I was screamed at and told that I was a "F---
> ing P----" b/c I didn't "F---" one of my female
> customers and cheat on my wife.  He then proceeded to
> confront two random male customers just walking out of
> the mens room by our table and yelled at them asking
> "How much of a F---ing P---- is this guy for not F---
> ing a piece of a-- who's drop dead gorgeous just b/c
> he's married".  This incident was witnessed by every
> sm in d264, jason carter and matt shea.
>
> Charlie, I was publicly humiliated and never
> expected to have to deal with this type of situation
> when I came to work for The Home Depot.  It[ ] [ha]s
> been almost a year now and I've been doing everything
> in my power both mentally and emotionally to put that
> confrontation behind me and try to have a decent
> working relationship with Gene Kelly.  Unfortunately,
> the memories of this incident are constantly being
> reinforced by the day to day comments from Gene asking

10

me "So how's your girlfriend?  Did you sleep with her
yet?".  These comments are causing me to constantly
confront the fact that I am obviously not living up to
his expectations by not engaging in sexual
relationships with female customers outside of
marriage.  I've also begun to worry that hourly
associates could possibly overhear his comments and
start spreading rumors.  Additionally, at concord's
inventory last week this incident involving Gene and
myself was once again brought up in group discussion
by all of the SMs and Gene acknowledged how it was a
"funny night".  I immediately felt the embarrassment
and humiliation all over again and my boss smiled
taking pride in the incident.

Doc. no. 30-10.

Kelly issued Rolfs a third P/DN, document no. 24-10, dated
January 25, 2010.  That P/DN noted problems that were identified
during store walks on November 2 and December 3, 2009, and
reexamined during store walks on January 12 (conducted by Kelly,
and officials referred to as "DOM" and "DHRM") and January 16
(conducted by Kelly).  Rolfs contends that the criticisms in the
third P/DN were inaccurate, and has produced evidence that
neither he nor his staff ever saw Kelly in his store on January
16, and that Kelly does not appear on any of the store's
surveillance video for that day.

On February 8, 2010, Rolfs met with Deveno.  It is
undisputed that Rolfs mentioned Kelly's in-store boorishness and
the party rant at that meeting.

On February 10, 2010, Kelly received verbal counseling that
was documented in a P/DN.  That P/DN states, in pertinent part:

11

> 2 – Eric Rolfs has not had any performance
> conversations until recently – and why is that?
> Perception is that it is because Paul is pushing the
> issue with Gene.
>
> 3 – Gene is too close to his SM and district team.
> Gene feels too comfortable with them and makes
> inappropriate comments and uses inappropriate language
> frequently – many times within an ear shot of
> associates.  His behavior violates the respect policy.
>
> 4 – Gene does not know how to model effective
> leadership for his weaker SMs (Eric Rolfs, Bill McLean
> and Dan Kalkoff) and in turn they are struggling.

Doc. no. 30-4.  In another part of Kelly's P/DN, under the

heading "State the improvement & action plan to address [the]

issue," id., the P/DN states, in a recitation of corporate

values: (1) "The Company is committed to providing an

environment of mutual respect, free of harassment and

discrimination for our associates, customers and vendors," id.;

and (2) "The Home Depot will not tolerate any retaliation or

threats of retaliation against anyone who exercises his or her

legal rights under any employment laws or makes good-faith

reports of workplace harassment, sexual harassment or

discrimination . . .," id.  The P/DN goes on to define both

"retaliation" and "protected conduct."

From March 8 through 11, 2010, Kelly and Rolfs attended a

Home Depot store-managers meeting in Los Angeles.  In Los

Angeles, Kelly invited several store managers to a strip club.

Rolfs declined.

On March 16, 2010, Kelly issued Rolfs a fourth P/DN, document no. 24-11, based upon conditions related to maintenance and shopability that Kelly identified during store walks on March 2 and March 12.  Rolfs again contests the validity of the criticisms in the P/DN, and points out that the March 12 walk was conducted the day after he returned from Los Angeles, before he had a chance to address the issues on which Kelly based the P/DN.

On March 22, Rolfs had a second meeting with Deveno.  With regard to Kelly's sexually oriented conduct, Rolfs complained that in Los Angeles: (1) when another manager brought up Kelly's party rant, Kelly did nothing to prevent him from continuing to talk about it; and (2) Kelly invited him to a strip club.  That same day, Rolfs sent Deveno an e-mail mentioning: (1) Kelly's "vulgar taunting and questioning of [his] 'manhood' dealing with the fact that [he] wouldn't have sex and cheat on [his] wife with a female customer," doc. no. 30-21; and (2) the Los Angeles strip-club invitation which, in Rolfs words, "reinforce[d] the harassment [he] received at [Kelly's] hands as earlier discussed," id.  With regard to his understanding of the reason why Kelly had issued the four P/DNs, Rolfs explained:

> The language in Gene's write up makes it very clear he
> is looking to build a case right before reviews are
> given to place me on the path toward termination.  I

again believe this stems from the sexual harassment I
received at his hands at the district xmas party '09.

Id.

The next day, Kelly placed Rolfs on a sixty-day Performance

Improvement Plan ("PIP").  Under the heading "Leader's Summary

Assessment" in a document titled "Performance and Development

Summary," the following reasons are given for placing Rolfs on a

PIP.

> Most of the coaching/counseling sessions with Eric
> have focused on Eric's leadership in regards to
> driving his team to execute core standards including
> instock, store maintenance and Customer service.  Eric
> has received [P/DNs] on 11/8/2009, 12/4/2009,
> 1/25/20[10], and 3/16/2010 about poor execution
> involving store maintenance, in stock, and service.
> The stores overall maintenance including the following
> areas: out of stocks, maintenance, bay maintenance
> have been inconsistent with the Compan[y']s
> expectations.  On repeated occasions Eric and his team
> were spoken to about the condition of the inside of
> the building.  Specifically, the lay down areas for
> events, they are disorganized and with out [sic] a
> theme, there is no planning around these vents.  Eric
> has not developed or executed a sustainable plan to
> maintain the standards inside his building, . . . he
> has taken a reactive approach rather than a proactive
> approach to managing the building.  This has
> negatively impacted the associates who have had to
> redo projects several times due to Eric's planning and
> lack of proper explanation.  On 2/25/2010, DM Kelly
> walked 3482 and noted several projects that were part
> of District and Regional pla[n]s that were not
> completed properly, this included the flooring end cap
> project.  These projects needed to be redone by the
> associates because Eric did not follow the specific
> instructions given to complete them.
>
> On several occasions the ASM team has been walked on
> out of stocks and they could not answer to the status

14

of the out of stocks [nor] could they identify what
was on transfer to address the issue.  Eric has not
given his ASM team the coaching and training that they
need to successfully run the daily operations of the
business.  Nor has he given them the appropriate
direction that they need to get things done.  As a
result the A[SM] team is inhibited from making sound
decisions regarding the business.

On 3/12/2010, the out of stock condition of the store
was poor.  Eric ensured that the out of stocks would
be under 100 by the end of the weekend.  In order to
do this, he needed to utilize his ASMS to run
transfers during the weekend which would take them
away from the weekend business.  The following Monday
out of stocks topped close to 700.

Doc. no. 24-12.

In response to being placed on a PIP, Rolfs sent an e-mail

to Deveno.  He began by stating his disagreements with the four

P/DNs he had received, and then continued:

As you recall I came to you on Feb 8th because I
was convinced that Gene was on a track toward my
termination revolving around extremely inappropriate,
vulgar sexual ranting at the Christmas party (Jan '09)
in front of the entire district.  His yelling at me
with obscenities suggesting I was homosexual because I
wouldn't have sex with a female pro customer were
absolutely not representative of the Home Depot's core
values.  Gene repeated these highly offensive sexual
comments to me numerous times while on store visits
over the summer of '09.  My problems with Gene
heightened dramatically when I made it clear I had no
interest in being unfaithful to my wife toward the end
of the summer of '09.  As I've stressed to you before
Gene has created hostile sexual work environment where
I am not comfortable.  Even after our meeting in
February Gene's sexual suggestions continue.  My
fourth [P/DN] immediately followed my return from LA
where I refused to go to a strip club with him as he
suggested.  I feel his efforts to terminate me are in

part based on my continued response to his totally
inappropriate sexual suggestions.

Doc. no. 24-15, at 2.  He concluded by stating: "I feel if my
performance was viewed by any other Home Depot District Manager
the result would be dramatically different and without bias as
it was prior to my rebuking of Gene's sexual innuendos."  Id.
The next day, Deveno walked Rolfs' store.  Afterward, Deveno
wrote a statement titled "Unannounced Walk in Store
#3482/Manchester, NH and Subsequent Conversation with Store
Manager, Eric Rolfs."  Doc. no. 30-23.  Among other things, the
statement says:

> After my walk, I sat with Store Manager Eric Rolfs and
> told him I had walked the store, on his behalf to
> validate or dismiss the things that are in his PIP and
> to determine whether they're a true assessment or not.
> . . .  I told him he has real, true issues as a Store
> Manager, as outlined in the PIP.  In the end, I left
> him with this fact; if I was the DM, based on today's
> snapshot, I'd be having the same, if not harsher,
> conversations on in-stock, store appearance and
> customer service than Gene is having with him.

Id.

On April 8, 2010, Rolfs filed a charge of discrimination
against Home Depot with the New Hampshire Commission for Human
Rights ("HRC").  On April 19, Rolfs met with Worcester and
discussed Kelly's conduct.  After Worcester learned, the next
day, that Rolfs had filed a charge of discrimination, he stopped
speaking with Rolfs about Kelly.  In addition, during its

16

investigation of Rolfs' complaints about Kelly, Home Depot suspended Rolfs' PIP.  On May 19, Rolfs sent Deveno an e-mail giving two weeks notice, and indicating that he was taking a less lucrative position with another company.  It appears to be undisputed that at the time he resigned, Rolfs knew that Home Depot had suspended his PIP.

Based upon the foregoing, Rolfs sued Home Depot in two counts.  Count I is a discrimination claim brought under both 42 U.S.C. § 2000e-2(a)(1) and RSA 354-A:7, I.  Count II is a retaliation claim brought under both 42 U.S.C. § 2000e-3(a) and RSA 354-A:19.

## Discussion

Home Depot moves for summary judgment on both of Rolfs' claims.  The court considers each in turn.

### A. Count I - Discrimination

Count I is captioned "Sex-Based Hostile Work Environment Culminating in Tangible Adverse Employment Actions."  In his complaint, Rolfs states his claim in the following way:

> Whether it was because Rolfs did not fit Kelly's stereotyped expectations that a male store manager in his district should objectify women, or because Kelly was enforcing some unspoken, misogynist hegemony, Kelly used sexual comments, questions, and suggestions to attack and criticize Rolfs' masculinity and

humiliate Rolfs, repeatedly, and thereby subjected him
to a hostile work environment because of sex.

Kelly's abuse became more severe and pervasive
when Rolfs objected to Kelly's sexually degrading
behavior.

Thereafter, Kelly launched a campaign of
harassment and unfounded discipline and criticism, to
demonstrate he had all the power, and to force Rolfs
back in line, or drive him out.

Kelly's sexual harassment culminated in tangible
employment actions against Rolfs.  Kelly issued
unfounded disciplinary actions and an unjustified PIP
that deprived Eric of his performance bonus.
Furthermore, Kelly's harassment, and The Home Depot's
failure to take reasonable remedial measures to make
the harassment stop, culminated in Rolfs' constructive
discharge.

First Am. Compl. (doc. no. 5) ¶¶ 62-65.

Home Depot argues that it is entitled to summary judgment

on Count I because: (1) Rolfs' state-law discrimination claim is

completely barred, and his federal discrimination claim is

diminished, by the applicable limitation periods; and (2) even

if not time-barred, Rolfs' claims fail on the merits.  Home

Depot is entitled to judgment as a matter of law on Count I

because Rolfs has failed to produce evidence that would allow a

reasonable jury, properly instructed, to determine that he was

discriminated against because of his sex.

The court begins by noting that Rolfs' claims lie well

outside the heartland of federal and state anti-discrimination

law.  That is, he does not claim that Kelly subjected him to

abusive conduct merely because he was a man.  Rather, he
attributes Kelly's conduct to one of two things: (1) his failure
to "fit Kelly's stereotyped expectations that a male store
manager in his district should objectify woman"; or (2) Kelly's
attempt to "enforce[e] some unspoken, misogynist hegemony."

Based upon the language of his complaint, it might seem
that Rolfs was attempting to plead "the 'gender stereotyping'
variation of sex-based discrimination." Morales-Cruz v. Univ.
of P.R., 676 F.3d 220, 224 (1st Cir. 2012) (citing Price
Waterhouse v. Hopkins, 490 U.S. 228, 250-51 (1989) (plurality
opinion)).  "A gender-stereotyping claim arises when an
individual suffers an adverse employment action because she [or
he] either conforms or fails to conform to some stereotype or
stereotypes attributable to her [or his] gender." Morales-Cruz,
676 F.3d at 224-25 (citing Thomas v. Eastman Kodak Co., 183 F.3d
38, 59 (1st Cir. 1999); Pivirotto v. Innovative Sys., Inc., 191
F.3d 344, 355 (3d Cir. 1999) (observing that Title VII protects
against an employer's decisions to "fir[e] women it perceives as
not feminine enough (or as too feminine)").  But,
notwithstanding the complaint's references to gender
stereotypes, the recitation of the elements of Rolfs' cause of
action in his memorandum of law makes it clear that Count I is a
traditional hostile-work-environment claim, see doc. no. 30-1,

19

at 22 (citing O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001), rather than a discrimination claim based upon gender stereotyping.[6]

"Because the New Hampshire Supreme Court relies on Title VII cases to analyze claims under RSA 354-A, the court will address [Rolfs' state and federal] claims together using the Title VII standard." Hudson v. Dr. Michael J. O'Connell's Pain Care Ctr., Inc., 822 F. Supp. 2d 84, 92 (D.N.H. 2011) (citing Madeja v. MPB Corp., 149 N.H. 371, 378 (2003); Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 856–57 (1st Cir. 2008); Slater v. Town of Exeter, No. 07-cv-407-JL, 2009 WL 737112, at *4 n.5 (D.N.H. Mar. 2009)).

"Title VII prohibits employers from discriminating against individuals 'because of such individual's race, color, religion, sex, or national origin . . . .'" Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 186 n.5 (1st Cir. 2011)) (quoting 42 U.S.C. § 2000e-2(a)(1)). "Requiring a person 'to work in a

---

[6] It is not at all clear that the beliefs Rolfs attributes to Kelly, i.e., that males should objectify women and cheat on their wives, are stereotypes (rather than perverse personal predilections) that could support a gender-stereotyping claim. See Morales-Cruz, 676 F.3d at 225 (affirming trial court's dismissal of gender-stereotyping claim where "the plaintiff assert[ed] that she was unfairly terminated because [her supervisor] and others expected her, as a woman, to report [an inappropriate] student-teacher relationship" in her workplace, and "the supposed stereotype of which the plaintiff complain[ed] [was] not one that, by common knowledge or widely shared perception, is understood to be attributable to women").

discriminatorily hostile or abusive environment' violates Title VII." Gerald v. Univ. of P.R., 707 F.3d 7, 17 (1st Cir. 2013) (quoting Valentín-Almeyda v. Mun'y of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006)); citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Torres-Negrón v. Merck & Co., 488 F.3d 34, 39 (1st Cir. 2007) (quoting Harris, 510 U.S. at 21).

Turning to the elements of his claim, for Rolfs to prevail, he must show:

> (1) that [he] is a member of a protected class; (2) that [he] was subjected to unwelcome harassment; (3) that the harassment was based on [his] membership [in] the protected class; (4) that the harassment was so severe or pervasive that it altered the conditions of [his] employment and created an abusive work environment; (5) that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Torres-Negrón, 488 F.3d at 39 (citing O'Rourke, 235 F.3d at 728; Faragher v. City of Boca Ratón, 524 U.S. 775, 787-89 (1998)).

Home Depot argues that Rolfs cannot establish the third element of his claim, i.e., that he was subjected to harassment based upon his membership in a protected class.  Specifically,

21

Home Depot argues that both Kelly's in-store boorishness and his party rant were mere unactionable workplace banter rather than harassment based upon Rolfs' sex.  Rolfs says that "Kelly created an unlawful hostile environment by using sex-related conduct and comments to demean and humiliate [him] as a man." Pl.'s Mem. of Law (doc. no. 30-1) 1.  He also cites authority for the proposition that conduct that is not overtly sexual, such as Kelly's management decisions and disciplinary actions following the "Come on, Gene" incident, may be used to support a Title VII sex-discrimination claim based upon a hostile work environment.  Rolfs concludes his argument this way: "Sex, and Rolfs' [un]willingness to satisfy Kelly's sexual fantasies or fulfill Kelly's expectations of his masculinity, or put up with Kelly's repeated humiliations, was at the heart of the hostile environment Kelly subjected Rolfs to."  Id. at 24.

There is indeed a problem with the third element of Rolfs' claim.  To establish that element, Rolfs must show that he was subjected to harassment based on his membership in a protected class.  See Higgins v. New Balance Ath. Shoe, Inc., 194 F.3d 252, 258 (1st Cir. 1999) ("no claim lies [under Title VII] unless the employee presents a plausible legal theory, backed by significantly probative evidence, to show, inter alia, that the hostile environment subsisted because of such individual's race,

color, religion, sex, or national origin.") (quoting 42 U.S.C. § 2000e-2(a)(1)).  In Higgins, the court of appeals affirmed the trial court's grant of summary judgment against a Title VII plaintiff claiming discrimination based upon his sexual orientation, because, "as drafted and authoritatively construed, Title VII does not proscribe harassment simply because of sexual orientation." 194 F.3d at 259 (citing Hopkins v. Balt. Gas & Elec. Co., 77 F.3d 745, 751-52 & n.3 (4th Cir. 1996); Williamson v. A.G. Edwards & Sons, 876 F.2d 69, 70 (8th Cir. 1989)).  Thus, to succeed on a Title VII claim, a plaintiff must allege and prove membership in a protected class.

Nowhere in his pleadings does Rolfs specifically identify the protected class to which he belongs, and he certainly does not claim that Kelly harassed him only because he is a man.  The closest he comes is a factual allegation, in his complaint, that "[a]s a married man, and a born again Christian, [he] found Kelly's comments offensive."  First Am. Compl. (doc. no. 5) ¶ 10.

If this were a typical sexual-harassment case, in which the plaintiff and the alleged harasser were male and female, establishing the protected class in which the plaintiff claims membership would not pose much of a problem.  See O'Rourke, 235 F.3d at 728 (citing Oncale v. Sundowner Offshore Servs., 523

U.S. 75, 80 (1998)).  But this is not such a case; both Rolfs
and Kelly are men.  Thus, it is not so easy for Rolfs to
establish that Kelly harassed him because he is a man.

Notwithstanding Rolfs' failure to identify a protected
class to which he belongs, his December 19, 2009, e-mail to
Worcester, document no. 30-10, and his e-mails to Deveno on
March 22 and 23, 2010, document nos. 30-21 and 24-5, shed light
on the purported protected class in this case.  In all three e-
mails, Rolfs complained that Kelly harassed him because he did
not act on Kelly's repeated suggestions that he commit adultery
by having sex with the female customer who frequented his store.
Thus, Rolf is not claiming that he was harassed for being a man,
but that he was harassed for being a faithful spouse.

There are several problems with such a claim.  First, Rolfs
seems to be contending that if he had been willing to engage in
adultery, then Kelly would not have created a hostile work
environment for him.  But, of course, "faithful spouse" is not a
protected category under either Title VII, see 42 U.S.C. §
2000e-2(a)(1), or New Hampshire's Law Against Discrimination,
see RSA 354-A:7, I.  Accordingly, under either statute, a claim
of faithful-spouse discrimination would not survive a motion to
dismiss for failure to state a claim.

However, given Rolfs' references to Kelly's expectations of "male store manager[s]" and "misogynist hegemony," his claim could, perhaps, be read as asserting that he was the victim not of faithful-spouse discrimination, but of faithful-husband discrimination.  Such a claim falls into a special category of Title VII claims known as "sex-plus," which is described in Higgins.

In Higgins, after rejecting a claim based upon sexual orientation, as falling outside the scope of Title VII, the court further explained:

> The Supreme Court has made clear in Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998) that, in same-sex harassment cases as in all sexual harassment cases, the plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations," but in fact constituted discrimination "because of . . . sex." Id. at [80].  The statutory "because of . . . sex" requirement is not met merely because workplace harassment involves sexual matters: the substance of the violation is discrimination based on sex or, as the Court put the matter, "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  Id. (internal quotation marks omitted).

Id. at 258-59 (parallel citations omitted).

On appeal, the plaintiff in Higgins recast his claims, and presented two new theories to explain why the harassment he suffered was because of his sex.  See 194 F.3d at 259.

> His first, a "sex-plus" theory, posits that the employer discriminated against men - and only men -

25

> who possessed certain qualities.  Eminent authority
> indicates that such a course of action, if proven, may
> constitute discrimination "because of . . . sex."  See
> Phillips v. Martin Marietta Corp., 400 U.S. 542, 544
> (1971) (per curiam) (reversing summary judgment and
> holding that an employer may have violated Title VII
> by treating women with pre-school-age children
> differently than men with children of the same age).
> Riding this horse for all it is worth, the appellant
> identifies the culpable trait - for which men were
> punished but women were not - as either a sexual
> attraction to men or, alternatively, homosexuality.

Id. (parallel citations omitted).

If Rolfs is not claiming faithful-spouse discrimination, but instead, faithful-husband discrimination, that claim would fall into the sex-plus category.  The problem is that in response to Home Depot's argument that he could not show that he was harassed because of sex, Rolfs has not produced any evidence to create a triable issue regarding his discrimination claim.

The Court of Appeals for the Tenth Circuit has provided a good description of the evidence necessary to support a sex-plus claim, also known as a "gender-plus" claim:

> In Phillips v. Martin Marietta Corp., 400 U.S.
> 542 (1971) (per curiam), the plaintiff's claim of
> gender discrimination was based on the fact that the
> employer refused to accept applications from women
> with pre-school-age children, but did not enforce that
> policy against men.  The Supreme Court held that the
> "Court of Appeals . . .  erred in reading [Title VII]
> as permitting one hiring policy for women and another
> for men-each having pre-school-age children."  Id. at
> 544.  The Court thus created a cause of action for
> "gender-plus" discrimination; that is, Title VII not
> only forbids discrimination against women in general,
> but also discrimination against subclasses of women,

such as women with pre-school-age children.  See,
e.g., King v. Trans World Airlines, 738 F.2d 255 (8th
Cir. 1984) (alleging gender-plus-child care
discrimination); Inda v. United Air Lines, 565 F.2d
554 (9th Cir. 1977) (alleging gender-plus-marriage
discrimination), cert. denied, 435 U.S. 1007 (1978);
Sprogis v. United Air Lines, 444 F.2d 1194 (7th Cir.)
(same), cert. denied, 404 U.S. 991 (1971).

     To be actionable, however, gender-plus
discrimination must be premised on gender.  As one
scholar has artfully explained, Title VII contemplates
gender-plus claims because

          when one proceeds to cancel out the common
          characteristics of the two classes being compared
          ([e.g.,] married men and married women), as one
          would do in solving an algebraic equation, the
          cancelled-out element proves to be that of
          married status, and sex remains the only
          operative factor in the equation.

Lex K. Larson, Employment Discrimination § 40.04, at
40-12 (2d ed. 1996) (emphasis added).  Thus, although
the protected class need not include all women, the
plaintiff must still prove that the subclass of women
was unfavorably treated as compared to the
corresponding subclass of men.  See, e.g., Fisher v.
Vassar College, 70 F.3d 1420, 1448 (2d Cir. 1995)
(holding that plaintiff's gender-plus-child-care claim
was not adequately supported by the evidence because
she failed to compare the tenure experience of women
who took leaves of absence for child rearing with the
tenure experience of men who took similar leaves of
absence); Bryant v. International Sch. Servs., 675
F.2d 562, 575 (3d Cir. 1982) ("No evidence was before
the trial court to show that married males, in
circumstances similar to [the married female]
appellants, received better, or even different
treatment."); Willingham v. Macon Tel. Publ'g Co., 507
F.2d 1084, 1089 (5th Cir. 1975) ("The practical effect
of interpreting Sec. 703 [of the Civil Rights Act] to
include [gender-plus] discrimination is to impose an
equal protection gloss upon the statute, i.e.
similarly situated individuals of either sex cannot be
discriminated against vis à vis members of their own

sex unless the same distinction is made with respect
to those of the opposite sex.").

    Thus, despite Ms. Coleman's vigorous arguments to
the contrary, gender-plus plaintiffs can never be
successful if there is no corresponding subclass of
members of the opposite gender.  Such plaintiffs
cannot make the requisite showing that they were
treated differently from similarly situated members of
the opposite gender.

Coleman v. B-G Maint. Mgmt. of Colo., Inc., 108 F.3d 1199, 1203-
04 (10th Cir. 1997) (emphasis in the original) (parallel
citations omitted).

    Based upon Coleman, a sex-plus claim must be proven by
demonstrating differential treatment.  Here, Home Depot could
only be liable if Rolfs were able to prove that Kelly treated
women who were faithful to their spouses better than he treated
men who were faithful.  That would be a sex-discrimination
claim.

    But, Rolfs has neither alleged differential treatment of
any sort nor produced any evidence that Kelly treated women
better than he treated men.  Because the only claim that Rolfs
could possibly assert in Count I is a sex-plus claim, and
because he has produced no evidence of differential treatment,
he cannot prove that Kelly subjected him to a hostile work
environment because of his sex, which entitles Home Depot to
judgment as a matter of law on Count I.

In sum, it cannot be disputed that Kelly's in-store
boorishness and his party rant were sexually charged and
extremely offensive.  Those factors alone, however, are not
enough to establish that Kelly's conduct, unsavory as it may
have been, was sexual harassment or sex discrimination that
violated Title VII or New Hampshire's Law Against
Discrimination.  See Higgins, 194 F.3d at 258 ("The record makes
manifest that the appellant toiled in a wretchedly hostile
environment.  That is not enough, however, to make his employer
liable under Title VII . . . .").

### B. Count II - Retaliation

Count II is captioned "Retaliatory Hostile Work Environment
Culminating in Constructive Discharge."  In it, Rolfs claims
that he engaged in four activities protected by the anti-
retaliation provisions of Title VII and New Hampshire's Law
Against Discrimination, and that Kelly engaged in a variety of
conduct that constituted unlawful retaliation.

Specifically, Rolfs alleges that he engaged in protected
activity by: (1) opposing Kelly's suggestions that he have sex
with his female customer during the "Come on, Gene" incident;
(2) complaining to Worcester in December of 2009 about Kelly's

harassment and retaliation;[7] (3) complaining to Deveno in February of 2010 about Kelly's harassment; and (4) filing a charge with the HRC in April of 2010.  Rolfs alleges that Kelly retaliated against him by: (1) "administer[ing] unfounded PDNs . . . to justify putting [him] on a PIP to deprive him of his earned performance bonuses," First Am. Compl. (doc. no. 5) ¶ 70(b); (2) subjecting him to a retaliatory hostile work environment and depriving him of "supportive, problem-solving, constructive criticism designed to help [him] and his store succeed and meet sales goals and profit margins," id. ¶ 70(b); (3) making "a mockery of The Home Depot's performance improvement process, and refus[ing] to acknowledge [his] performance toward the unjustified performance improvement goals," id. ¶ 70(c); and (4) "leak[ing] his PIP status to members of management in other stores in the district," after he filed his complaint with the HRC, id. ¶ 72.

In his memorandum of law, Rolfs describes the adverse employment actions he claims to have suffered this way:

---

[7] While Rolfs now says that he complained to Worcester about retaliation by Kelly, the text of the December 19 e-mail from Rolfs to Worcester makes clear that Rolfs was not accusing Kelly of retaliating against him for anything he had done but, rather, was accusing Kelly of using the P/DN process to strike at him preemptively, as some sort of follow-up to his party rant, which had occurred about eleven months previously.

> By placing Rolfs on a PIP in March 2010, Kelly
> deprived Rolfs of a bonus that would have exceeded
> $18,000 that Rolfs had earned in the second half of
> 2009 because of his performance in sales and profit.
> Kelly's ongoing harassment,[8] and Home Depot's failure
> to remedy the hostile environment, forced Rolfs to
> resign his position at Home Depot for a much less-
> lucrative position where he could salvage his career.
> Thus, Rolfs has satisfied the adverse employment
> action element of his retaliation claim.

Pl.'s Mem. of Law (doc. no. 30-1) 27-28.  That passage can

reasonably be read as a retrenchment from the complaint, which

identified both the PIP and the P/DNs as affirmative adverse

employment actions.  But, on the other hand, later in his

memorandum, Rolfs accuses Kelly of "launch[ing] a campaign of

harassment, and unfounded discipline and criticism," id., and

contends that "it is clear that the pretextual disciplinary

actions were part of Kelly's retaliatory efforts," id.  While

Rolfs' memorandum is not entirely clear on this point, the court

will read it expansively, and presume that Rolfs intends to

assert that Kelly retaliated against him by putting him on a PIP

and by issuing the P/DNs that led to the PIP.  That said, the

court begins with the relevant law and then turns to Rolfs' two

retaliation claims, one based upon Kelly's disciplinary actions,

the other based upon a purported constructive discharge.

---

[8] It is not clear whether the "harassment" to which Rolfs
refers is Kelly's sexually oriented conduct, his actions as a
District Manager, or both.

31

Like Count I, Count II asserts claims under both Title VII and RSA 354-A.  As with Count I, the court will conduct a single analysis under the standard applicable to Title VII.  See Hudson, 822 F. Supp. 2d at 92.  The Title VII anti-retaliation provision makes it unlawful

> for an employer to discriminate against any of its employees . . . because [they have] opposed any practice made an unlawful employment practice by this subchapter, or because [they have] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a)).  The mechanics for making and defending against a retaliation claim are as follows:

> To make out a prima facie case of retaliation under the familiar McDonnell Douglas burden-shifting framework, a plaintiff must show that: (1) [he] engaged in protected activity under Title VII, (2) [he] suffered an adverse employment action, and (3) the adverse employment action was causally connected to the protected activity.  Collazo v. Bristol–Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973).  If a plaintiff makes this showing the burden swings to the defendant "to articulate a legitimate, non-retaliatory reason for its employment decision." Collazo, 617 F.3d at 46.  If a defendant can do this then the burden travels once more to the plaintiff to show that the reason is pretext and that retaliatory animus was the real motivating factor.  Id.

Gerald, 707 F.3d at 24 (parallel citations omitted).  With respect to the third element of the prima facie case, the Supreme Court has recently held that "[t]he text, structure, and history of Title VII demonstrate that a plaintiff making a

retaliation claim under [42 U.S.C.] § 2000e-3(a) must establish
that his or her protected activity was a but-for cause of the
alleged adverse action by the employer." Univ. of Tex. Sw. Med.
Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013).

### 1. The P/DNs and the PIP

Rolfs first claims that Kelly retaliated against him by
issuing him four P/DNs and putting him on a PIP.  Of course, one
does not just retaliate, one retaliates against another person
for having done something.  Here, for Kelly's alleged
retaliation to be actionable, he must have retaliated against
Rolfs for engaging in activity protected by Title VII or RSA
chapter 354-A.

Rolfs' complaint identifies four instances of protected
activity.  But, it is undisputed that Rolfs filed his HRC
complaint after Kelly imposed the PIP, which means that Kelly
could not have imposed the PIP (or issue the P/DNs that
precipitated the PIP) in retaliation for Rolfs' HRC complaint.
See Pearson v. Mass. Bay. Transp. Auth., 723 F.3d 36, 42 (1st
Cir. 2013) ("Causation moves forward, not backwards, and no
protected conduct after an adverse employment action can serve
as the predicate for a retaliation claim.") (citing Sullivan v.
Raytheon Co., 262 F.3d 41, 49 (1st Cir. 2001)).  At the other
end of the time line, Kelly gave Rolfs his first P/DN after the

"Come on, Gene" incident.  Moreover, it is indisputable that Kelly was aware of that incident, and Kelly's knowledge is necessary but not sufficient to establish causation.  See Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013) ("Obviously too, the employee must show that the retaliator knew about [his or] her protected activity – after all, one cannot have been motivated to retaliate by something he [or she] was unaware of.") (citing Alvarado v. Donahoe, 687 F.3d 453, 458–59 (1st Cir. 2012); Lewis v. Gillette Co., 22 F.3d 22, 24 (1st Cir. 1994)); Pearson, 723 F.3d at 42 (explaining that an alleged retaliator's "knowledge alone cannot provide the causal link").

That leaves two potential instances of protected activity that could have been causally connected to the disciplinary actions Kelly took against Rolfs, to wit, the complaints Rolfs made to Worcester and to Deveno about Kelly's behavior.  For purposes of ruling on Home Depot's motion for summary judgment, the court will assume that the P/DN Kelly received on February 10 alerted him to Rolfs' complaints about him to Worcester and Deveno.  See Medina-Rivera, 713 F.3d at 139 (suggesting that an alleged retaliator's "awareness [of protected activity] may be shown by circumstantial evidence").  Rolfs, however, has produced no evidence, circumstantial or otherwise, that Kelly knew about Rolfs' complaints about him any earlier than February

10.  Thus, Kelly's knowledge of those instances of protected activity came after he had issued three of the four P/DNs at issue, but did predate the fourth P/DN and the PIP.  In the remainder of this section, the court considers, in turn, retaliation claims based upon the "Come on, Gene" incident and Rolfs' complaints about Kelly to Worcester and Deveno.[9]

### a. "Come on, Gene"

Home Depot contends that Rolfs cannot establish his prima facie case because "Come on, Gene" did not rise to the level of protected activity.  Indeed, if "Come on, Gene" was not protected activity, then even if Kelly did retaliate against Rolfs for saying those words, any such retaliation would fall outside the scope of Title VII and RSA chapter 354-A.  Rolfs contests Home Depot's characterization of "Come on, Gene."

For the proposition that "Come on, Gene" did not rise to the level of protected activity, Home Depot relies upon several opinions, including Morgan v. Massachusetts General Hospital, 901 F.2d 186 (1st Cir. 1990).  In Morgan, the plaintiff

---

[9] Those complaints are two different instances of protected activity, but there is no reason not to consider them together. Kelly learned about them simultaneously.  Moreover, Rolfs must show that Kelly knew about those complaints if he is to establish that Kelly retaliated against Rolfs for making them, see Medina-Rivera, 713 F.3d at 139, which makes the date on which Kelly learned of those complaints more important, legally, than the dates on which Rolfs made them.

complained that he was sexually harassed at a Christmas party by a co-worker who "asked him to dance with him, and started to 'pull on him.'" 901 F.2d at 188.  Even though the plaintiff "told his supervisor . . . about the Christmas party incidents," id., and "that the co-worker [from the Christmas party] sometimes stood behind him as he was mopping, causing him to bump into the co-worker," see id., the court of appeals affirmed the district court's determination that the plaintiff had failed to establish that he had engaged in protected activity, because, when he talked to his supervisor, "he failed to specify any particular prohibited practices that he opposed and/or sought to change," id. at 194; see also Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 594 (2d Cir. 1988) (explaining, when affirming trial court's determination that plaintiff failed to establish prima facie case of retaliation, "we agree with Judge Goettel that appellant's objections at the time neither pointed out discrimination against particular individuals nor discriminatory practices by Columbia").

Rolfs incorrectly argues that the rule from Morgan on which Home Depot relies was effectively abrogated by the Supreme Court's decision in Crawford v. Metropolitan Government, 555 U.S. 271 (2009).  Judge Lipez has described Crawford in the following way:

The Supreme Court recently addressed the scope of the
opposition clause in Crawford.  The Court held that
the term "oppose," left undefined by the statute,
carries its ordinary meaning, which includes "'to
resist or antagonize . . .; to contend against; to
confront; resist; withstand,'" or "'to be hostile or
adverse to, as in opinion.'"  Id. at [276] (quoting
Webster's New International Dictionary 1710 (2d ed.
1958) and Random House Dictionary of English Language
1359 (2d ed. 1987)).  Applying this standard, the
Court held that a plaintiff who did not initiate a
complaint about sexual harassment nevertheless engaged
in protected conduct under the opposition clause.  Id.
at [273].  In response to questions posed to her
during an internal investigation, the plaintiff
described various instances of sexually harassing
behavior by another employee.  The Court held that
plaintiff's responses to employer questioning could
reasonably be seen as resistant or antagonistic to the
sexually harassing treatment, "if for no other reason
than the point . . . explained by an EEOC guideline:
'When an employee communicates to her employer a
belief that the employer has engaged in . . . a form
of employment discrimination, that communication'
virtually always 'constitutes the employee's
opposition to the activity.'"  Id. at [276] (quoting 2
EEOC Compliance Manual §§ 8-II-B(1),(2), p. 614:0003
(Mar. 2003)).  The Court rejected the Sixth Circuit's
view that the opposition clause required an employee
to engage in "active, consistent 'opposing'
activities" and to instigate or initiate a complaint.
Id. at [277].

Collazo, 617 F.3d at 46-47.  Nothing in Crawford abrogated

Morgan's holding that to qualify as protected activity, an

employee's statement to his employer must provide adequate

specificity to alert the employer that the employee is, in fact,

complaining about conduct proscribed by Title VII.

Standing alone, the words "Come on, Gene" neither pointed

out discrimination or discriminatory practices, see Manoharan,

842 F.2d at 594, nor specified the conduct that Rolfs purportedly opposed, see Morgan, 901 F.2d at 194.  If those three words were the only evidence before the court, it would be relatively easy to dismiss "Come on, Gene" as insufficient to qualify as protected conduct.  But, as Rolfs points out, Kelly engaged in no further in-store boorishness after Rolfs said "Come on, Gene."  That, in turn, is good evidence that notwithstanding whatever interpretation a third party might give the words "Come on, Gene," Kelly himself regarded those words as a complaint about his in-store boorishness.  Because Rolfs could have reasonably believed, in good faith, that Kelly's in-store boorishness violated Title VII, the court will treat "Come on, Gene" as protected activity.  See Morales-Cruz, 676 F.3d at 226 (citing Collazo, 617 F.3d at 48; Fantini v. Salem State Coll., 557 F.3d 22 (1st Cir. 2009); Wimmer v. Suffolk Cnty. Police Dept., 176 F.3d 125, 134 (2d Cir. 1999)).

To establish the second element of his prima facie case, Rolfs must show that he "suffered an adverse employment action." Gerald, 707 F.3d at 24 (citation omitted).

> Title VII's antiretaliation provision does not "immunize . . . employee[s] from those petty slights or minor annoyances that often take place at work and that all employees experience," Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); rather, it seeks "to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms," id. (quoting Robinson v. Shell Oil Co.,

519 U.S. 337, 346 (1997)).  Thus, to qualify as
materially adverse, an employer's challenged action
"must be one that 'could well dissuade a reasonable
worker from making or supporting a charge of
discrimination.'"  Dixon v. Int'l Bhd. of Police
Officers, 504 F.3d 73, 81 (1st Cir. 2007) (quoting
Burlington, 548 U.S. at 57).

Colon v. Tracey, 717 F.3d 43, 50 (1st Cir. 2013) (parallel

citations omitted).

Rolfs claims that Kelly retaliated against him for "Come

on, Gene" by issuing him four P/DNs and placing him on a PIP.

However, it is difficult to characterize the P/DNs as adverse

employment actions for purposes of a Title VII retaliation

claim.  Hours after Rolfs received his second P/DN, which

mentioned the process by which P/DNs can lead to a PIP, he

called Worcester and complained about Kelly's in-store

boorishness and his party rant.  Within a week of receiving his

third P/DN, Rolfs contacted Worcester again, and about a week

after that, Rolfs complained to Deveno about Kelly's in-store

boorishness and his party rant.  Then, about a week after he

received his fourth P/DN, Rolfs had another meeting with Deveno

to discuss Kelly's behavior.  And, hours after Kelly placed him

on a PIP, Rolfs sent Deveno another e-mail complaining about

Kelly's sexual behavior.  While Kelly's first disciplinary

action against Rolfs came weeks, if not months, after "Come on,

Gene," Rolfs complained to Deveno about Kelly's alleged sexual

harassment hours, if not minutes, after Kelly's final
disciplinary action.

Based upon the undisputed evidence, it seems fair to
conclude that rather than inhibiting Rolfs from complaining
about discrimination, the P/DNs, and even the imposition of a
PIP, actually inspired him to do so.  Moreover, Rolfs' pattern
of responding to P/DNs and his PIP by complaining, almost
immediately, about Kelly's sexually oriented behavior calls to
mind the First Circuit's explanation for why an alleged
retaliator's mere knowledge of protected conduct is not enough
to establish the causation element of a retaliation claim: "Were
the rule otherwise, then a disgruntled employee, no matter how
poor his performance or how contemptuous his attitude toward his
supervisors, could effectively inhibit a well-deserved discharge
by merely filing, or threatening to file, a discrimination
complaint."  Pearson, 723 F.3d at 42 (quoting Mesnick v. Gen.
Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991)).

In sum, Rolfs' own conduct undermines any argument that the
P/DNs were adverse employment actions for purposes of his
retaliation claim.  If the P/DNs were not adverse employment
actions, then Rolfs' first retaliation claim is reduced to an
assertion that Kelly placed him on a PIP in retaliation for

"Come on, Gene."[10]  But, even if the P/DNs are also adverse employment actions, Rolfs faces an insurmountable problem in establishing the third element of his prima facie case, causation.

The court of appeals has held that "[v]ery close temporal proximity between protected activity and an adverse employment action can satisfy a plaintiff's burden of showing causal connection." Sánchez-Rodríguez, 673 F.3d at 15 (quoting Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004); citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74) (2001)) (emphasis added, internal quotation marks omitted).  In Sánchez-Rodríguez, a span of three months between the filing of an EEOC complaint and an employer's disciplinary action was held to be sufficient temporal proximity to satisfy the plaintiff's burden of showing a causal connection.  See 673 F.3d at 15.  In Calero-Cerezo, the court held that a span of one month was sufficient, see 355 F.3d at 26, but also noted that "[t]hree and four month periods have been held insufficient to establish a causal connection based on temporal proximity," id. at 25 (citing Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir.

---

[10] Given that the PIP had been suspended by the time Rolfs resigned, it is certainly arguable that, at the time of Rolfs' resignation, the PIP no longer qualified as an adverse employment action.

1997)); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992)).

In the typical case, both the date of the protected activity and the date of the allegedly retaliatory act are undisputed.  Here, Kelly issued Rolfs' first P/DN in early November of 2009, and put him on a PIP in late March of 2010.  Rolfs, however, concedes his inability to say when the "Come on, Gene" incident happened, placing it "approximately in – some time in around spring to summer of 2009," id.

Even if the "Come on, Gene" incident occurred toward the end of the summer of 2009, it happened too far in advance of the PIP for causation to be established by temporal proximity.  As for the P/DNs, the court notes that: (1) a span of three or four months between protected activity and an adverse employment action is pretty much the outer limit for establishing causation through temporal proximity; and (2) Rolfs can do no better than to place "Come on, Gene" somewhere within a span of six months that ended no later than late September of 2009.  Thus, even if the P/DNs were adverse employment actions, there is nothing beyond mere speculation to establish that even the earliest P/DN was issued soon enough after "Come on, Gene" to establish causation based upon temporal proximity, and "[c]onclusions that rest wholly on speculation are insufficient to defeat a motion

for summary judgment," Alvarado, 687 F.3d at 460 (quoting Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010)).

Then, there is Rolfs' own view of causation, as demonstrated by the undisputed record evidence.  In Rolfs' December 19, 2009, e-mail to Worcester he did not describe his first two P/DNs as retaliation for "Come on, Gene."  He did not even mention the "Come on, Gene" incident.  Rather, he described those two P/DNs as "preemptive strikes" flowing from Kelly's party rant.  See doc. no. 30-10.  In other words, Rolfs appears to characterize Kelly's disciplinary actions as "retaliation" for something Kelly did, not as retaliation for something he did.  As late as March of 2010, after Kelly had issued him two more P/DNs and put him on a PIP, Rolfs was saying the same thing to Deveno.  See doc. nos. 30-21 (March 22 e-mail) & 24-15 (March 23 e-mail).  Thus, Rolfs himself did not understand either his P/DNs or his PIP to be retaliation for "Come on, Gene" at the time those disciplinary actions were imposed, when "Come on, Gene" was still relatively fresh in his mind.

Finally, Rolfs' memorandum of law says next to nothing about the causation element of his prima facie case.  His discussion of causation is limited to this:

> [Kelly's] abuse became more severe and pervasive when
> Rolfs opposed Kelly's conduct, and showed he would no
> longer accede to the degradation.  Kelly launched a

43

> campaign of harassment,[11] and unfounded discipline and
> criticism, to demonstrate he had all the power, and to
> force Rolfs back in line, or force him out.
>
>     In this way, prior disciplinary action is not
> always determinative of the causation question.  An
> employer is not inoculated from all future retaliation
> claims once it counsels an employee.  In the case at
> bar, it is clear that the pretextual disciplinary
> actions were part of Kelly's retaliatory efforts.

Pl.'s Mem. of Law (doc. no. 30-1) 29.  Those conclusory

statements are not enough to establish that "Come on, Gene" was

the cause of Rolfs' P/DNs or his PIP, under either the but-for

standard established in Nassar, or the more liberal standard the

Supreme Court rejected in that opinion.  See Pearson, 723 F.3d

at 42 ("We have rejected claims on this ground [i.e., the

plaintiff's failure to establish the causal link element of a

retaliation claim] when the allegations are 'largely conclusory

and lacking in the concrete documentation necessary to prove the

causal link.'") (quoting Ramos v. Roche Prods., Inc., 936 F.2d

43, 49 (1st Cir. 1991)).

     However, even if the P/DNs were adverse employment actions,

and even if "Come on, Gene" was the but-for cause of any of the

P/DNs or the PIP, Rolfs' retaliation claim would still fail, at

the third step of the McDonnell Douglas framework.  Under that

---

[11] It is undisputed that Kelly's in-store boorishness ceased
completely as a result of "Come on, Gene," which makes it
difficult to see what Rolfs means when he says that "Kelly
launched a campaign of harassment" after Rolfs opposed his
conduct by saying "Come on, Gene."

framework, Rolfs' establishment of a prima facie case shifted the burden to Home Depot "to articulate a legitimate, non-retaliatory reason for its employment [actions]." Gerald, 707 F.3d at 24 (citation omitted).  Because the P/DNs and the Performance and Development Summary ("P&DS") form that accompanied Rolfs' PIP all explained why they were issued, Home Depot has carried its burden.  Rolfs does not argue to the contrary.  Thus, for Rolfs to avoid summary judgment, he must produce evidence from which a reasonable jury could conclude that Kelly's reasons for disciplining him, i.e., those described in the P/DNs and the P&DS form, were actually pretexts intended to hide retaliatory animus.  Rolfs has not produced the evidence necessary to avoid summary judgment on the issue of pretext.

Home Depot argues that Rolfs has no evidence with which to carry his burden of showing pretext.  In his memorandum of law, Rolfs focusses exclusively on his prima facie case, primarily by arguing that "Come on, Gene" was protected activity, and he does not refer to the McDonnell Douglas framework at all.  Thus, he has nothing to say about his obligation to show that Home Depot's explanations for his P/DNs and his PIP were pretextual. Rather, to the extent that he addresses pretext at all, he does

so through stray references to "unwarranted discipline,"[12] Pl.'s
Mem. of Law (doc. no. 30-1) 28, "unfounded discipline and
criticism," id. at 29, and "pretextual disciplinary actions,"
id.  While Rolfs uses those phrases, he does not actually argue
that the reasons given for his discipline were pretextual.

Turning to the legal principles that must guide this
court's consideration of pretext, the court of appeals has
explained:

> "[T]here is no mechanical formula for finding
> pretext." Che v. Mass. Bay Transp. Auth., 342 F.3d
> 31, 39 (1st Cir. 2003) (internal quotation marks
> omitted).  Instead, "[i]t is the type of inquiry where
> 'everything depends on the individual facts.'"  Id. at
> 40 (quoting Thomas v. Eastman Kodak Co., 183 F.3d 38,
> 57 (1st Cir. 1999)).  The inquiry focuses on whether
> the employer truly believed its stated reason for
> taking action adverse to the employee.  See Feliciano
> de la Cruz v. El Conquistador Resort & Country Club,
> 218 F.3d 1, 7 (1st Cir. 2000).  The plaintiff bears
> "[t]he ultimate burden of persuading the trier of fact
> that the defendant intentionally discriminated against
> the plaintiff."  Reeves v. Sanderson Plumbing Prods.,
> Inc., 530 U.S. 133, 143 (2000) (alteration in
> original) (internal quotation mark omitted).

---

[12] Specifically, Rolfs argues that "Kelly used his authority
over [him] to impose unwarranted discipline to punish [him] and
force him back into acquiescence – the quintessential quid pro
quo sexual harassment."  Pl.'s Mem. of Law (doc. no. 30-1) 28.
According to the First Circuit, "[q]uid pro quo sexual
harassment is when a supervisor uses his superior position to
extract sexual favors from a subordinate and, if rebuffed,
retaliates by taking action that adversely impacts the
subordinate's employment."  Gerald, 707 F.3d at 20 (citation
omitted).  As Rolfs has not alleged that Kelly sought to extract
sexual favors from him, his invocation of quid pro quo sexual
harassment seems inapt.

Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 116 (1st Cir. 2013) (parallel citations omitted).  In other words, when "assessing whether an adverse employment decision is pretextual, [a court] do[es] not sit as a super-personnel department that reexamines an entity's business decisions." Espinal v. Nat'l Grid NE Holdings 2, LLC, 693 F.3d 31, 35 (1st Cir. 2012) (quoting Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002); citing Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988)) (internal quotation marks omitted).  Rather, the court's task "is limited to determining whether the employer 'believe[d] in the accuracy of the reason given for the adverse employment action.'" Espinal, 693 F.3d at 35 (quoting Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 76 (1st Cir. 2008); citing Feliciano de la Cruz, 218 F.3d at 7).

Here, the court has no difficulty concluding that the reasons stated in the P&DS for placing Rolfs on a PIP were not pretextual.  Before Kelly placed Rolfs on the PIP, he had issued Rolfs four P/DNs.  The first P/DN, dated November 8, 2009, came close on the heels of store walks by both Kelly and Deveno, and it is undisputed that after a store walk in late October or early November, Deveno was dissatisfied with the condition of Rolfs' store.  The third P/DN was based, in part, on a "District Business Walk" conducted by Kelly and two other Home Depot

managers.  See doc. no. 24-10.  The participation of several
managers other than Kelly in store walks that led to two of the
P/DNs that led to Rolfs' PIP undermines any suggestion that
Kelly was using either the P/DNs or the PIP to engage in a
vendetta against Rolfs.  Rather, that fact strongly supports a
conclusion that the appraisals of Rolfs' performance reflected
in the P/DNs and the P&DS were shared by Home Depot management
as a whole, not just the individual manager who Rolfs identifies
as his antagonist.

Moreover, after Kelly put Rolfs on his PIP, Deveno visited
Rolfs' store, at Rolfs' suggestion, and confirmed the existence
of the conditions on which Kelly based his decision to impose
the PIP.  Finally, in the P/DN that was issued to Kelly in
February of 2010, Rolfs was specifically identified as one of
Kelly's "weaker SMs."  Doc. no. 30-4.

In several of his communications with Worcester and Deveno,
and in his memorandum of law, Rolfs has argued that Kelly,
Deveno, and Home Depot should have used different metrics to
evaluate his performance.  But, "mere questions regarding the
employer's business judgment are insufficient to raise a triable
issue as to pretext."  Pearson, 723 F.3d at 41 (quoting Acevedo-
Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 140 (1st Cir.
2012)); see also Espinal, 693 F.3d at 35 (citation omitted).

The only possible exception to that rule would be a situation in which an employer bases an adverse employment action on a business decision that is so ridiculous as to render the employer's purported reliance upon that decision unworthy of credence. See Aly v. Mohegan Council, Boy Scouts of Am., 711 F.3d 34, 46 (1st Cir. 2013) (citing Tex. Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 256 (1981)); see also Gómez-González v. Rural Opps., Inc., 626 F.3d 654, 662-63 (1st Cir. 2010) ("Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.") (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)). As Rolfs has done nothing more that suggest that his performance should have been evaluated in terms of his store's profit margins rather than in terms of its appearance, or the customer service provided by its employees, he has come nowhere close to providing a basis from which a reasonable factfinder could conclude that the reasons given for Rolfs' P/DNs and his PIP are unworthy of credence.

In sum, there is ample evidence that Kelly and his superiors thought Rolfs was a poor performer and believed the

P/DNs and the P&DS to be accurate.  Rolfs has produced no
evidence to the contrary.  Thus, he cannot establish that the
reasons given for his P/DNs and his PIP were pretextual.  That,
in turn, is fatal to his claim that Kelly imposed those
disciplinary measures in retaliation for "Come on, Gene."

### b. Rolfs' Complaints to Worcester and Deveno

Home Depot contends that Rolfs cannot establish a prima
facie case that Kelly retaliated against him for complaining to
Worcester and Deveno because of two causation problems: (1)
Rolfs' complaint to Worcester came, at the very earliest, after
he had received his first two P/DNs; and (2) Rolfs has produced
no evidence that Kelly knew about his complaints to either
Worcester or Deveno.

With regard to Home Depot's second argument, the court has
already assumed that the P/DN Kelly received in February of 2010
informed him that Rolfs had complained to Worcester and/or
Deveno about his in-store boorishness and his party rant.  With
regard to Home Depot's first argument, there is some merit to
the idea that Rolfs cannot establish causation because the
possibility that his deficient performance could lead to a PIP
was expressly mentioned in his second P/DN, which predated his
complaint to Worcester.  See Breeden, 532 U.S. at 272
(explaining that an employer's "proceeding along lines

previously contemplated, though not yet definitively determined, is no evidence whatever of causality"). But, the "burden of establishing a prima facie case of retaliation" is "relatively light." Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 32 (1st Cir. 2011) (quoting DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008); citing Mariani-Colón v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007)). Accordingly, the court assumes that Rolfs has established a prima facie case of retaliation for the complaints he made about Kelly to Worcester and Deveno.

As with the retaliation claim based upon "Come on, Gene," Home Depot also argues that Rolfs cannot carry his burden on the issue of pretext. Home Depot is correct. The discussion of pretext in the previous section applies with full force to Rolfs' claim that Kelly issued him the March 16 P/DN and placed him on a PIP because he had complained about his in-store boorishness and his party rant to Worcester and Deveno.

### c. Summary

Because Rolfs has not established that his P/DNs were adverse employment actions, has not established the causation element of his prima facie case vis à vis his "Come on, Gene" retaliation claim, and has failed to produce evidence that the reasons given for issuing his P/DNs and placing him on a PIP were pretextual, Home Depot is entitled to judgment as a matter

of law on Rolfs' claim that he was subjected to Home Depot's
disciplinary process in retaliation for opposing conduct
proscribed by Title VII and RSA chapter 354-A.

### 2. Constructive Discharge

Rolfs also asserts that he was constructively discharged by
Home Depot as a result of being forced to work in intolerable
conditions, and that his constructive discharge was a second
adverse employment action for purposes of his retaliation
claims.  In the abstract, that is a viable legal theory:

> That a series of minor retaliatory actions may,
> when considered in the aggregate, satisfy the
> McDonnell Douglas prima facie "adverse action"
> requirement, is settled law in this Circuit.  See,
> e.g., Noviello [v. City of Boston], 398 F.3d [76,] 91
> [(1st Cir. 2005)] (holding that "subjecting an
> employee to a hostile work environment in retaliation
> for protected activity constitutes an adverse
> employment action"); see also Billings v. Town of
> Grafton, 515 F.3d 39, 54 n.13 (1st Cir. 2008).  But,
> as the third prima facie factor commands, it is
> similarly accepted that alleged retaliatory actions
> against an employee must bear a causal connection to
> some protected conduct in order to establish a prima
> facie claim that rests on a hostile work environment
> theory.  Consequently, "[i]t is only those actions,
> directed at a complainant, that stem from a
> retaliatory animus which may be factored into the
> hostile work environment calculus." Noviello, 398
> F.3d at 93.

Alvarado, 687 F.3d at 458-59.  While "a series of minor
retaliatory actions may, when considered in the aggregate,
satisfy the McDonnell Douglas prima facie adverse action

requirement," id. (citation omitted), a "string of trivial
annoyances will not suffice to make an adverse action showing:
the alleged harassment must be severe or pervasive," id. at 461
(quoting Gómez-Pérez v. Potter, 452 F.App'x 3, 9 (1st Cir.
2011); citing Che, 342 F.3d at 40) (internal quotation marks
omitted).

Moving from the quantitative realm to the qualitative, it
is well established that, for purposes of Title VII, a work
environment may be rendered hostile both by conduct that is
explicitly racial or sexual and by conduct that is not. See
Rosario v. Dep't of the Army, 607 F.3d 241, 248-49 (1st Cir.
2010) (citing Marrero v. Goya of P.R., Inc., 304 F.3d 7, 20 (1st
Cir. 2002); O'Rourke, 235 F.3d at 730). But, as the opinion in
O'Rourke points out, for non-sexual conduct to contribute to a
sex-based hostile work environment, the non-sexual conduct must
be charged with discriminatory animus. See 235 F.3d at 29
(citing Lipsett v. Univ. of P.R., 864 F.2d 881, 905 (1st Cir.
1988)); see also Alvarado, 687 F.3d at 459.

Typically, when sexual (or racial) and non-sexual (or non-
racial) conduct are properly aggregated in the context of a
hostile-work-environment claim, the discriminatory animus of the
non-sexual or non-racial conduct is demonstrated by the fact
that both forms of conduct are roughly contemporaneous and

intertwined.  See, e.g., DeGrace v. Rumsfeld, 614 F.2d 796, 800 (1st Cir. 1980); Williams v. Gen. Motors Corp., 187 F.3d 553, 559 (6th Cir. 1999).  Here, however, Rolfs has produced no evidence that Kelly engaged in any sex-related conduct near enough in time to any of the non-sexual acts that Rolfs calls hostile to support a reasonable inference that those non-sexual acts were charged with discriminatory sexual animus.  Rather, according to Rolfs' own complaint, see doc. no. 5 ¶ 63, and all the evidence he has produced, the "Come on, Gene" incident marked a sharp line of demarcation between Kelly's sexual conduct and his non-sexual conduct.  That line of demarcation, in turn, is a significant part of the "totality of circumstances," O'Rourke, 235 F.3d at 730, that courts must consider when evaluating hostile-work-environment claims, see id.

The only connection between the two that Rolfs posits is his theory that Kelly transferred his competent assistant managers, issued him four P/DNs, and placed him on a PIP in attempt to fire him, an attempt that Rolfs characterizes as somehow growing out of Kelly's party rant.  The problem is that with regard to the theory he advances, Rolfs does not "'point to specific facts that were properly asserted in . . . affidavits and supporting materials' which would permit a reasonable juror

to find in his favor at trial," Alvarado, 687 F.3d at 460

(quoting Floyd v. Farrell, 765 F.2d 1, 5 (1st Cir. 1985); citing

Over the Rd. Drivers, Inc. v. Transp. Ins. Co., 637 F.2d 816,

818 (1st Cir. 1980)).  Absent any provable connection between

Kelly's explicitly sexual conduct and his non-sexual conduct,

the only working conditions at issue in the following analysis

are those that were explicitly sexual in nature, i.e., Kelly's

in-store boorishness and his party rant.

Rolfs relies upon Marrero to support his assertion that he

was constructively discharged.  In Marrero, the court of appeals

explained:

> In order to establish that Goya should be held
> responsible for the economic losses she suffered as a
> result of quitting, Marrero had to show that her
> working conditions were "so difficult or unpleasant
> that a reasonable person in [her] shoes would have
> felt compelled to resign." Alicea Rosado v. Garcia
> Santiago, 562 F.2d 114, 119 (1st Cir. 1977).  The
> standard is an objective one; it "cannot be triggered
> solely by the employee's subjective beliefs, no matter
> how sincerely held." Suarez v. Pueblo Int'l, Inc.,
> 229 F.3d 49, 54 (1st Cir. 2000); see also Calhoun v.
> Acme Cleveland Corp., 798 F.2d 559, 561 (1st Cir.
> 1986) ("[T]he law does not permit an employee's
> subjective perceptions to govern a claim of
> constructive discharge." (internal quotation marks
> omitted)).

304 F.3d at 28; see also Gerald, 707 F.3d at 25.

The Marrero court described the employee's objectively

intolerable working conditions this way:

Marrero was subjected to constant harassment by Cárdenas during the year and a half she spent at Goya. To be sure, the fact that the plaintiff endured a hostile work environment — without more — will not always support a finding of constructive discharge. See Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."). Rather, the jury must find that the working conditions were so unpleasant that "staying on the job while seeking redress [would have been] intolerable." Keeler v. Putnam Fid. Trust Co., 238 F.3d 5, 10 (1st Cir. 2001). In addressing that question, however, the jury reasonably can take into account how the employer responded to the plaintiff's complaints, if any. An employee's assessment of whether she can remain at work while pursuing remedies for the harassment she has endured obviously will be affected by the likelihood that the harassment will continue unabated.

         . . . .

[T]he jury reasonably could have found that "a reasonable person in [Marrero's] shoes would have felt compelled to resign." Alicea Rosado, 562 F.2d at 119. Given the inadequacy of the transfer after a long history of hostility and frequent complaints, Marrero reasonably believed that her working conditions at Goya would not change and that she could only anticipate more of the same intolerable harassment. If she wanted to avoid further harm, she would have to leave work entirely. See Cortes v. Maxus Exploration Co., 977 F.2d 195, 200-01 (5th Cir. 1992) (affirming finding of constructive discharge where employer refused to take adequate corrective measures to protect employee from future harassment).

Marrero, 304 F.3d at 29.

     Rolfs' reliance upon Marrero is unavailing. The plaintiff

in that case endured sexual harassment throughout the course of

her employment. See 304 F.3d at 14-16. Here, in contrast, it

56

is undisputed that with the exception of the Los Angeles strip-club invitation – which the court hesitates to characterize as sexual harassment, given Rolfs' history of accepting such invitations in the past – Kelly completely stopped making sexually oriented comments to Rolfs many months before Rolfs left his position at Home Depot.  Moreover, the harasser in Marrero continued to sexually harass the plaintiff after she confronted him, and even ratcheted up the vulgarity of his harassment thereafter.  See id. at 14.  Here, it is undisputed that after Rolfs said "Come on, Gene," Kelly completely stopped his boorish in-store behavior.  Similarly, while the sexual harassment in Marrero did not abate as a result of the complaints the plaintiff raised, see id. at 15-16, the alleged sexual harassment in this case had ended long before Rolfs first complained to Worcester about Kelly.

Not only does the time gap between Kelly's last act of alleged sexual harassment and Rolfs' resignation make this case distinguishable from Marrero, it raises a problem of its own. In the words of the First Circuit:

> [T]he timing of Gerald's resignation does nothing to
> help her case.  "If a plaintiff does not resign within
> a reasonable time period after the alleged harassment,
> he was not constructively discharged."  Landrau-Romero
> v. Banco Popular De Puerto Rico, 212 F.3d 607, 613
> (1st Cir. 2000).  Here Gerald voluntarily resigned
> from the University (and immediately started in a more
> lucrative position) a little over a year after the

57

> final act of harassment . . . .  Her resignation came
> too late after the offensive conduct . . . to be
> labeled a constructive discharge.  See id. (seven
> month period between harassing acts and resignation
> was found to be too long to support a constructive
> discharge claim); Smith v. Bath Iron Works Corp., 943
> F.2d 164, 167 (1st Cir. 1991) (six month period too
> great for a constructive discharge claim).

Gerald, 707 F.3d at 26.  Depending upon when during the spring
and summer of 2009 the "Come on, Gene" incident occurred, Rolfs
voluntarily resigned at least seven and a half months after the
final act of alleged harassment.  That is too long a span of
time to support a claim that Rolfs was constructively discharged
as a result of Kelly's alleged sexual harassment.  See id.

Finally, on the undisputed facts of this case, no
reasonable jury could find that it would have been intolerable
for Rolfs to stay on the job while seeking redress for Kelly's
purported sexual harassment.  At the time of his resignation
Rolfs had, in fact, remained on the job for more than four
months while pursuing redress.  Perhaps more importantly, he
resigned after his PIP had been suspended, pending the results
of Home Depot's investigation into his complaints about Kelly.

In short, Rolfs has produced no evidence to show that it
was reasonable for him to believe that he had to resign in order
to escape from Kelly's alleged sexual harassment.  Rolfs' own
testimony establishes that Kelly's objectionable conduct had
ceased between six months and one year before Rolfs left Home

Depot.  Construing the undisputed evidence in Rolfs' favor, no reasonable juror could conclude that Kelly's alleged sexual harassment forced him to resign.  As a matter of law, Rolfs did not suffer a constructive discharge resulting from the manner in which Home Depot responded to his charges of sexual harassment.  Home Depot, therefore, is entitled to judgment as a matter of law on Rolfs' second theory of retaliation.

## Conclusion

For the reasons detailed above, Home Depot's motion for summary judgment, document no. 23, is granted.  The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge

September 20, 2013

cc:  Tracy A. Bernson, Esq.
     Tracy Thomas Boland, Esq.
     M. Amy Carlin, Esq.
     Robert J. Roy, Esq.
     Michael T. Pearson, Esq.
     Jeffre S. Siegel, Esq.